Bosch, et al. Thank you, Your Honor. Good morning, Your Honors, and may it please the Court. Sarah Barenhout on behalf of Appellants Darius DuBosch and Dr. Faraz Harsini. Everything Your Honors need to know about this case is contained within the undisputed public records and video footage attached to the complaint. Those records establish that Discovery Green is a public park. The City purchased the land, funded its development, expressly requires it be maintained as a public park, and has held it out as a public park for almost 20 years. A few years ago now, DuBosch and Harsini made their fourth attempt to peacefully advocate on a matter of public concern in the Discovery Green Park. In response, DuBosch was arrested and forced to spend the night in jail. Dr. Harsini was threatened with arrest if he didn't leave the park grounds. And we know why this occurred, because defendants themselves tell us so repeatedly on camera. They found the content of DuBosch and Harsini's speech offensive. As one security guard put it, that's the only problem Discovery Green has. Well, okay, so I'm just trying to understand, my understanding from your opponent is they're saying that your clients could sit around and scream, la la la la la, but showing videos that are not talking, but are just showing videos of a bunch of animals getting hurt in front of a bunch of kids, that was the issue. Am I, are they wrong in saying that? So, Your Honor, the consideration of whether alternative avenues of expression exist is relevant only where we're considering a time, place, manner restriction. And that presupposes content neutrality. We know that, for instance, from this court decision in Knowles v. Waco, we know that from ample Supreme Court decisions. Here, we have a restriction that is content-based on its face. I mean, defendants themselves use the word content repeatedly on camera. Okay, but the content, as I understand it, and so tell me if I'm misunderstanding what your opponent says, is not what they are saying, but what they are showing on a video that is not a video, as opposed to them saying, oh, we love animals, but look, look, look. So, Your Honor, the muted documentary footage is inextricable from the message here. I mean, plaintiff's message is this is what industrialized farming practices look like. And how they convey that message is by showing muted video footage of those practices. Because, while I, so you agree that the key is the video? I do, Your Honor. Okay, so what I want to understand is what is your best published case on the subject of a video that's not saying anything, but just showing something, is, in fact, clearly within the First Amendment? What's your best case? Your Honor, the Supreme Court in U.S. v. Stevens specifically held that video footage depicting illicit animal cruelty, in that case it was illicit dog fighting, is protected expression. In Burston, the Supreme Court emphasized that film itself is not just protected expression, but it's one of the most important mediums for expression. In Brown v. EMA, the Supreme Court said that even violent, gruesome imagery is protected expression, even where it specifically targets minors. Now, defendants have characterized this video footage as violent and gruesome imagery, but just to put into perspective what we're actually talking about here, these are legal, commonplace farming practices, the kind of practices that people across Texas, Louisiana, and Mississippi are familiar with. I mean, any kid who's gone on a hunting trip and field dressed a deer has seen far more gruesome imagery than what we're talking about here. None of these practices are even covered under this country's animal cruelty laws. But again, even accepting defendants' characterization of this as violent and gruesome imagery, the Supreme Court has been very clear that that is protected expression, particularly in a traditional public forum. We do not childproof our public parks. Even if there's no talking? Even if there's no talking, Your Honor. And that, the message here was conveyed, I think is demonstrated by defendants' own statements on appeal. I mean, it's defendants, not plaintiffs, that describe this imagery as cruelty towards animals, as eliciting a very negative emotional  Again, like I said, I understand that, but I guess I'm just trying to make sure, and I'm well aware there are Supreme Court cases in this arena, well aware of this and that, but just trying to make sure I understand exactly what y'all's argument is with each other on this. Which, as I understand from your opponent, is just they don't want an unspoken video. They were willing to have your clients say what they want to say. They hate animals or they love animals. Are they this or are they that? They love these animals but hate those animals. They could sit around saying all that that they want to. And the video, obviously videos on like, you know, TV and stuff can certainly have comments and things. I'm well aware of that. Now, of course, in the 1700s, I don't think they had videos. But I'm well aware of that. But this is, to me, a little bit of a cubby, and I'm just trying to make sure I understand the cubby that's argued here. Sure, Your Honor. So a couple things in response. The first, you know, the Supreme Court, again, has been very, very clear. I'm reading from footnote 10 now of Consolidated Edison Company. The Supreme Court says, quote, we have consistently rejected the suggestion that a government may justify a content-based prohibition by showing that speakers have alternative means of expression. So where you have a content-based prohibition, and once again, we know this is content-based. Defendants use the word over and over on video. They also describe it in terms of its content as video footage depicting animal cruelty or violence towards animals. They also justify it on content-based means based on its potential impact on observers. That's not content-neutral. So we know this is a content-based prohibition. It does not matter whether there are alternative means of expression. Again, that's only relevant if we're talking about something that's content-neutral. If, for example, defendants wanted to ban screens entirely or say, you know, we're not going to have any kind of expressive activity within a certain distance from playgrounds, those would be content-neutral. They would be subject to a different analysis. It would depend on whether or not the government has a substantial interest that's unrelated to the suppression of expression, and in that case, whether alternative avenues of expression exist. But here, because it is content-based, it has to satisfy strict scrutiny, and not even defendants attempt to suggest that their prohibition could satisfy strict scrutiny. So let me follow up on that in two different respects. One is, I'm curious whether we even need to address these issues for you to obtain a reversal for your client. Do I understand correctly the district court didn't really reach the first amendment issue? It was mainly focused on the state action question, which you opened with appropriately, the clearly established issue and those sorts of things. But the first amendment issue itself, the core question, wasn't actually addressed by the district court. Is that correct? You're absolutely right, Your Honors. So we could theoretically reverse on the grounds on which the district court, you say, erred. Yes, absolutely. And just look unlimited at that, and then you guys can fight about this in the district court in the first instance. All right. My second question is, and it's sort of channeling some of Judge Haynes's energies on this in terms of the desire to protect children from inappropriate content. I take it you've already responded that the city can pass ordinances of various kinds. They just haven't done that in this case? So they can certainly pass, well, they could pass content-based ones so long as it passes strict scrutiny. They could certainly pass content-neutral ones as well, so long as it's a reasonable decision. But even a case like Snyder v. Phelps, I notice, you know, that's an IAED case, Tortive Intentional Infliction of Emotional Distress. It specifically reserves the question of whether a anti-funeral picketing law might have been okay. So in other words, even, I would imagine Snyder's one of your stronger cases where you're clearly disrupting with disturbing expression, disturbing for children who may attend this funeral. The Supreme Court, while finding a First Amendment interest there, specifically reserves the question of whether the government can then take actions to regulate. None of this, at the end of the day, needs to be addressed now. But I take it your point is that there is no ordinance here to address the concerns that the city might legitimately have. That's true, Your Honor. And I would also point out that in Snyder v. Phelps, I mean, the court emphasizes repeatedly that this is because we're talking about traditional public forum, just like we're talking about here. And we see an ample That's true. But even in the traditional public forum, as I'm reading on page 457 of Snyder, it talks about how Maryland has subsequently passed a law dealing with basically prohibiting funeral picketing just like that issue here. And the court specifically said we're not touching the question of whether that be enforceable today under the First Amendment. It's just the tort action. Yes, Your Honor. And in something like that, there would be content neutrals would be subject to a different analysis entirely that the court did not undertake in Snyder v. Phelps. And, Your Honor, going to the state action question, I mean, as you pointed out, the district court dismissed plaintiff's claims predominantly because of its finding that the conservancy is not a state actor. But that is simply wrong. I mean, even defendants did not dispute state action in their lengthy motions to dismiss. And that's because this is a situation where the government is completely entwined with the private conservancy. I mean, the private conservancy was established for the sole purpose of carrying out the governmental goal of operating a public forum. Its board of directors is appointed by the mayor, subject to approval by city council. Most of its funding comes from the government, which enables it to enact these rules and enforce them, for instance, through private security as we saw in the video footage. It's required to provide regular reporting to the city so that it can monitor its actions. And every single one of the rules it enacts is subject to the approval or disapproval of the mayor. And these are the kinds of considerations Given this confusion over whether they really are state actors or not, does that affect the qualified immunity of the police? No, Your Honor. I mean, for instance, you know, no one would imagine that in the National Mall in D.C., which is also operated by a private conservancy, security guards could kick out peaceful advocates, you know, carrying signs displaying images of aborted fetuses because the security guards find them offensive or because some other patrons find them offensive. I mean, the right to, the annual right to life march goes through there every year. It would be absolutely absurd if the private conservancy attempted what the conservancy attempted in this case. And while it's true that Discovery Green does not have the same national renown as the National Mall in D.C., in Houston it does. I mean, we're talking about what has been the city's premier public park for 20 years. So in terms of qualified immunity, Your Honor, where no reasonable officer could have found probable cause, there is no qualified immunity. This court made that clear, Judge Haynes, in your decision in Davidson, where it said there is no qualified immunity because it is objectively unreasonable for police officers to arrest individuals peacefully advocating on public land. I mean, here the district court found that there was probable cause based exclusively on the fact that the police officers believed the park was private. But probable cause is an objective analysis. What matters is whether or not that belief was reasonable, and it clearly was not. I mean, once again, we're talking about the city's premier public park, one of the most common venues of the city's large-scale protest activity, which law enforcement regularly helps facilitate, and we're talking about a situation where the police officers were repeatedly presented with undisputed public records establishing the park is public. And we see on video them consistently, you know, rejecting those records, declining to even look at them. And this court has made clear on multiple occasions in Bigford v. Taylor and Bailey v. Isles that police officers are not permitted to disregard facts tending to dissipate probable cause. And in situations where the circumstances raise questions as to whether probable cause exists, they are required to undertake some amount of investigation. I mean, we're not talking about a situation where police officers were forced to make snap judgment decisions under high pressure. You know, you can see on the video footage that Dubois and Harsini could not have been more courteous, more respectful. You see that from the time police officers arrive at the scene until they arrest Dubois, 15 minutes lapse. We allege in our complaint, and Officer Douglas confirms on camera, that he was present multiple times when Dubois and Harsini were previously expelled from the park. I mean, the police officers had ample opportunity to confirm this very simple factual question about whether or not the park was private or public, a simple phone call, you know, looking at the park's website. But instead, what they do is defer entirely to the conservancy. They say over and over on camera, it's up to the conservancy management. It's whatever management wants. But they are not the management's private security guards. They are law enforcement officers. And it was objectively unreasonable for them to undertake any amount of investigation to confirm this very simple factual question that probable cause was premised on. And Judge Haynes and Davidson, you point out that we require police officers to undertake far more nuanced First Amendment analyses in determining whether probable cause exists than the one here. I mean, in that case, you wrote that we require reasonable officers to balance the First Amendment rights of individuals who are peacefully advocating in front of abortion clinics with the rights of individuals to access those clinics. And that that analysis requires, for instance, consideration of factors like whether or not the advocates are obstructing the entrance, whether or not they're attempting to prevent people from entering. This is a far simpler question, a simple factual question of whether or not the park was private or public. Police officers had ample opportunity to confirm it, and they declined to do so. That is objectively unreasonable under this court's precedent. As to your qualified immunity theory in terms of the clearly established violation, what is what approach are you taking? Are you saying that there is clearly established law or that so? Yes, Your Honor. So so I mean, this court has said that there is, you know, clearly established the rights to advocate on public grounds. And that includes when the speech is offensive to others and for it to be deemed reasonable. This belief that the police officers had that the park was private. What's that? What's what? What are the cases that you think are the closest in terms of the in terms of overcoming you? I so Davidson's at Snyder. So all of those cases make it very, very clear that there is this right to peacefully advocate on public land, regardless of where anyone finds it offensive. As far as the mistake as to whether or not this land was private or public, you know, I have yet to see a case where police officers mistook a public park like this for private property. Um, and just to demonstrate how far afield lower courts analysis was the two cases. Just be clear. So there are 22 aspects of Q I that you might have to overcome. One is, uh, is it clearly established that this was a public park? Second is, is there a first amendment violation as to the second? What's what is that? That's why I was asking. Is it Davidson? Is it Snyder? What is it that makes it so obvious to you that this is a first amendment violation? Just change mentioned. These are videos that could be disturbing to some people. Yes, and I think that's a fair characterization. You're on that. It is kind of those two points playing together. So I would certainly point to Davidson where the courts that is objectively unreasonable to arrest a peaceful advocate exercising First Amendment rights and public land. Um, in terms of the group, your ideas pro life demonstrations can be disturbing to people who don't agree. Absolutely. The Snyder language was certainly disturbing to the people who attended the funeral. Far more so than anything we're talking about here. I would also point to this court's decision in Worldwide Street Preachers Fellowship where it found that, um, that life advocate fetuses. Yes, exactly. That they had a viable First Amendment claim. Um, that was unpublished. Right? That was unpublished. Yes, Your Honor. But we've seen, you know, similar to we have case law. Pardon my ignorance. Do we have case law on whether an unpublished decision can clearly establish law for Q. I generally don't know. That is a good question, Your Honor, and I'm not sure. But we would not rely on that case exclusively. There are plenty of other cases that say that, you know, gruesome, violent imagery, which again is the defendant's characterization, not ours. We are talking about legal commonplace farming practices, but even accepting their characterization, we have ample Supreme Court precedent establishing that that is protective. U. S. V. Stevens finding video of illicit dogfighting is protected expression. You know, Brown v. E. M. A. That violent and gruesome imagery is protected even when specifically targeting minors. I mean, here we're talking about again commonplace farming practices taking that is being shown in a traditional public forum, where at most minors might be among the viewers. Okay, you've saved time for rebuttal. Oh, yeah. Thank you, Your Honor. Okay, we'll now hear from Andrew Holland on behalf of everybody except the Houston Downtown Park Corporation. Thank you. Good morning, Your Honors. And may it please the Court, my name is Andrew Holland. Your Honors, there are a few points that counsel made here that I think need some clarification to understand the scope of what this case is about. This case is not about content-based discrimination. It is not about viewpoint discrimination. At no point in time were these individuals told you cannot speak about any particular topic. In fact, to the contrary, they were told multiple times in the videos that are attached to the complaint, you can say what you want. You can talk to people you want. You can, you just can't show these videos in the park. In fact, they were told you can take the videos to the perimeter. You can't play them in the park here. So we hear multiple times the argument that this is content-based discrimination. Respectfully, Your Honors, it is not. In their reply brief, the plaintiffs argued that there's no, that there's no term, that content is not a term of art, that the park employees were using the word content multiple times. It's the content of your videos, the content of the videos. Well, Your Honor, it is a term of art. The Supreme Court in Reed v. Town of Gilbert said that government regulation of speech is content-based if a law applies to particular speech because of the topic discussed or the idea or message expressed. Now, counsel just recited multiple cases from the Supreme Court discussing, uh, how gruesome videos, um, are protected. Uh, as you mentioned, U.S. v. Stevens, video footage, uh, containing dogfighting. Burson v. Wilson, excuse me, um, uh, videos where, or cases where videos are considered protected First Amendment speech. However, this case isn't about the plaintiffs being prohibited from having those videos. It's not, they're not being told if you possess those videos on Discovery Green, we're going to have you arrested. This is about the conduct, the conduct of playing those videos. That's, these are very important distinctions here, Your Honor. At no point in time are they told you can't have them. How do you deal with Snyder v. Phelps? I beg your pardon? How do you deal with Snyder? Well, Your Honor, he... Going to a funeral, uh, with, with, with the children of, of the decedent, uh, while protestors are displaying signs like, God hates fags, is extraordinarily disturbing to a lot of people, yet the Supreme Court decided eight to one that we have to protect the First Amendment, enforce the First Amendment rights there. Certainly is. So, whether one agrees with it or not, it was not unanimous, but it is binding precedent on our court. How do you deal with that? Certainly, Your Honor, the, the difference there is that that's speech, that those are words, the words are... And videos aren't speech? Videos are not speech, Your Honor. The video in Citizens United is not speech? The video, well, I beg your pardon, well, I'll, I'll rephrase that here. It's the specific conduct of, of playing these videos in the park, which in and of itself is not speech. So a video is speech, but, but playing the video is not speech? Right, so video, right, video... With respect, that's gibberish. Uh, but... That's gibberish. I mean, that, that can't possibly be right. Well, the, the, the possession of the video, if it's, if it's not obscenity, is protected. We're not suggesting that the video is that you can't play the video, that you can't possess the videos in your house. To play a video in a park... A book is speech, but if I read it out loud, it's not speech? I'm just trying to understand the dichotomy you're, you're establishing. Maybe, maybe I misheard it. No, no, that, I mean, the, so, the, the, the reading aloud of the book, the actual reading aloud, you know, depending on the context of how you're looking at that, may or may not be speech, right? So if, in this situation, to possess a video, that's not, wouldn't be considered obscenity, which of course, uh, can be prescribed by law. We're not arguing that these, that this is obscenity. It is, these are, these are lawful videos to possess. It is playing a video in a public park. That's conduct. The Supreme Court has never held that you're entitled to... Okay, well you agree that playing the video, as a general matter, is speech. You're just saying it's subject to regulation. Just, just because something's speech doesn't mean the government has no power. Respectfully, I, I disagree, Your Honor. Okay, I just want to understand your view. Playing a video is not speech, is what you're saying. Playing a video, so, this is going to be a fact-specific inquiry based on what the allegations are. So here, the, the video, it's a silent video, it is showing, and, showing acts towards animals, and, and counsel references that our brief refers to as cruelty towards animals. The actual video has never been put before the court. The plaintiffs cite to a, a link to a long documentary, which incidentally, you need to prove your age in order to access, but it's a long documentary. We don't know what portions they've selected to play, right? So, but assuming that those portions depict some sort of violence towards animals, in the context that we, that the facts are in this case, that is not speech. I'm sorry, is it, is it because they were muted? You said that there was no, I'm trying to understand your answer to Judge Ho, because you're, I'm confused, I'm, I'm sharing the same concerns. Certainly. So, well, so the, the first, so the, the bottom layer of the analysis here would be that it is not speech, it's not expressive content. Because there's no audio. Because, well, first because there's no audio, but also because it's not inherently expressive. So Supreme Court's very clear that, you know, if you engage in speech, it requires explanation, which the complaint acknowledges here. You show these videos, the videos don't depict kindness towards animals, they depict some sort of violence, presumably, towards animals. If you need to explain to passers-by what it's about, then it wouldn't be inherently expressive. Now, if, if the court considers it to be inherently expressive, then, yes, then it would be considered speech and be subject to reasonable time, place, and manner restrictions, and, and here the, it's very clear that what was being imposed was a time, place, and manner restriction. If the Westboro Baptist Church wasn't saying anything in Snyder v. Phelps, they were just holding the signs. The case comes out differently?   They're, they're muted. They're, they're just, they're just standing there holding signs. Signs are, are words. They're speech. Okay. Right. There's a, it's the actual content of those signs. So the First Amendment only applies to words? No. No. It's, it's the, the, the speech in those signs, the, the words are what are meant to be said. Right. So, and you're entitled to say, essentially, you know, the First Amendment allows you to say a lot of things. Um, in this, these videos were not the real words. There were no, there was nothing specific about the content of the message, nor, and this is most important here, the content of the message was not why the restrictions were being placed on these videos. It wasn't because the content was offensive. It was the video, what the videos depicted, as opposed to the message, as opposed to the, the actual content of the speech itself. It's not, we disagree with you that animal cruelty is bad. That's the distinction here. That this is not about, we, you know, the signs on those, the, the, the, the messages on those signs, it was the, it was what they said that was bad. It wasn't that they looked bad or the color scheme was bad. Well, with your, your opponent was asked about the fact that the, um, district court just really was looking at it as a private entity. If we were to determine this is not a private entity, it was a public entity. Should we remand on this issue of what the heck the video is? Is it really speech or not? Or are you saying there's an easy way to address that and affirm for that? Well, the, the court could affirm, uh, on the pleading deficiencies that the district court identified, particularly with respect to, uh, the Monell claim against the city, uh, and the qualified immunity claims against the officers. The plaintiffs have not adequately pled a Monell claim. Uh, they, they, they allege broadly that there's a policy of discrimination. The facts as pled in the complaint actually show the opposite. In fact, part of it. So just to be clear, your answer, you're saying we, we could decide just the QI issue, just the, the, the state action issue without addressing the first amendment issue? Uh, you, you could, you're, yes. The district court didn't deal with the first amendment, the, the core first amendment. It dealt with QI, it dealt with the things ancillary, but, but in terms of whether there's a first amendment violation, the district court didn't decide it. We need not decide that either. Correct. You're right. We could just decide the state action. Or could decide on state action and if the court found that there was, that there was state action, could certainly remand to the district court, um, to consider that or, but respectfully, your honor, for, at least for the majority of questions here, the, the district court certainly got it right and there's enough before the court on the pleadings on the complaint for the court to find that the, the, um, uh, the Monell claim was inadequately pled. In addition, your honor, I know the court below didn't reach this, but the plaintiffs have not pled a Monell claim against the conservancy. Um, every circuit in the country that has considered the issue, uh, and that's all but I believe the federal and DC circuits and this court, uh, have held that you need, you cannot allege a claim against a private entity acting under colored state law without meeting Monell standard. They haven't even tried to do that. Um, so, uh, as to the conservancy, the court can certainly, uh, uh, affirm the dismissal on the basis that it wasn't adequately pled. I have a quick question. I don't, correct me if I'm wrong, I don't believe either your brief or your co-counsel's brief, uh, discussed, uh, our precedent or our, sorry, our decision in the Worldwide Street Preachers case. Do you want to address that now? So the, so again, I take it you think it was wrongly decided, but, and it's unpublished. Worldwide Street, Worldwide Street Preachers, again, is, I, I believe this is the case. It was involving, this is an actual speech question as opposed to just videos. Just again, the, the, the issue here is unique. The other difference here is that, you know, this was a, there was a specific reason for the, the, the time, place, and manner restriction based on non-speech components to it. Um, which again, I think that's the significance. And Worldwide Street Preachers talks about pictures of aborted babies. Is that speech or no? So just a picture. Just a picture of the, so I guess it depends on the circumstances and, you know, in, what would be the circumstance where that is not speech? Give me your best circumstance where some. Having a picture of an aborted baby is, is not speech. Yeah. It's being used in a, in a context where it's not clear what it is. It's being displayed. It's being publicly displayed. But. And I, and I would agree, yes, in, in that context it certainly was speech. And here, if the court were to consider these videos to also be speech for the same reason, then, then they would still be subject to reasonable time, place, and manner restrictions. So and I recognize that that's. Your view is, I was giving you the chance to say that Worldwide was wrongly decided and unpublished, therefore not binding, but it sounds like you're saying it's fine. You don't, you have no quarrel. I'm not trying. Let me just finish my question and you can, I'm not putting words in your mouth, I promise. Are you saying it was, let me start over because I'm trying to get my question out and then I'll give you plenty of time. Was it incorrectly decided and unpublished, therefore not precedent and binding on us? That's option number one. Option number two is you have no need to contest it. You agree with it and it's completely distinguishable because it's X rather than Y. Which bucket are you on? I, I, I would have to defer again on the question, uh, as, uh, as counsel argued before. I, I don't know whether an unpublished decision would be binding, uh, considered binding authority. Binding authority on. It's, it's, it's, it's not. My, do you agree with it or not? Or do you think it's just distinguishable? I, I would agree that it's distinguishable. Okay. No, that's fine. I, I, I, that would, yeah, I think that would be my position at this point in time on that. Okay. Um, the, um, but again, the, the issue here is specifically with the, with respect to the fact that this was a time, place, and manner restriction, even if it's considered expressive conduct, I recognize certainly, yes, it is a tall order to argue that it's non-expressive, even though of course here you've got, you know, there, there's silent videos that are not showing the message. They're showing the opposite of the message. The court still considers that to be expressive conduct. These were reasonable time, place, and manner restrictions. Supreme Court has been very clear. You're not entitled to spread your message however you want to. Just to clarify though, is there an ordinance at issue that explains, uh, the, the arrest here or is it just, uh, sort of a decision by the people who operate the park? So these were... I'm, I'm going to the, the, just I don't want to hide the ball, I'm, I'm going to the language in Snyder that I mentioned earlier, where the Supreme Court specifically reserves the question of whether an ordinance would be okay. So these were rule, these were park rules. It was specific and it was a general, general broad park rule that prohibits you from interfering with other park users' enjoyment of the park. There was no specific, there's no specific rule that says you can't show silent videos.  So the city in theory, hypothetically, could pass such an ordinance and then we would presumably be back in court, but, but there is no such ordinance at issue here. Right. Other than the general criminal trespass statute. Correct. Right. That's correct. Right. It'd be a general criminal trespass statute, which is, which, which was the reason for the arrest. Right. Right. It was a specific park rule. The, the, the park rules, there's no general park rules or specific park rule that was cited to, this is a rule you violated. You can't show these videos in here. Um, I would submit, Your Honor, you don't, you don't actually, you don't actually need one. And this is the, I know it's not a Seventh Circuit, but the Milestone versus City Monroe case that we cited in our papers that dealt with the senior center where the rules said no vulgar language, no abusive language, no, no abuse to the staff and the plaintiff there argued kind of similarly to what's being argued here. Well, this gives you broad discretion. I mean, if you can, if, if it leaves it up to the, uh, uh, senior center leadership to decide what abusive languages, then they can decide whether or not I can, I can say something. And the Seventh Circuit held that it's, it's a, it's a content neutral regulation. It's doesn't matter why you're being abusive. If you're being abusive, you can't, you can't use abusive language. Um, so, and again, here, again, it's important to stress this had nothing to do with their message. If this was a hunting club, if this was a meat, uh, meat industry representative who wanted to show these videos, there's, there's been no allegation here that they would be treated any differently. And on the same point, Your Honor, if I may briefly, just before I run out of time here, um, as to custom and practice, a customer policy, uh, with respect to Monel, Monel claim against the city, there is absolutely, there are no allegations that this specific type of discrimination that they're alleging here has ever occurred before, let alone that it's widespread. In fact, the contrary, they've argued that there, there is no policy of discrimination, uh, by the city of Houston or by Discovery Green. Um, which again, is that they're, they're, uh, the theory of, uh, the Monel theory against the city is, is undermined by the fact that there are no facts. And similarly with failure to train, there was no, uh, articulated failure to train anybody here specific or generally speaking that would, uh, entitle them to relief on that basis. Thank you, Your Honor. Thank you. And we'll now hear from your call, semi-colleague, uh, which is Michael Wallace for Houston Downtown Park Corporation. May it please the Court. Michael Wallace for the Houston Downtown Park Corporation. Uh, the issue for my client today is a pleading problem, uh, Your Honors. Uh, the petition in this case is insufficient according to the Twombly standard regarding factual allegations against the Downtown Park Corporation with respect to the, the underlying issues, the First Amendment violations. Um, the Supreme Court has made clear that threadbare recitals of the elements of a cause of action that are supported by mere conclusory statements are not sufficient, will not beat a 12B6 motion to dismiss. The District Court was correct in dis-, in, in granting the 12B motion to dismiss as to the Houston Downtown Park Corporation. As this record shows in our briefing underscores, uh, the Downtown Park Corporation had no notice or knowledge of any of the incidents, uh, giving rise to this lawsuit. Uh, the, it is undisputed that the Downtown Park Corp. We, uh, delegated the sole rulemaking authority, the operational, the management of that part to the Conservancy. Uh, they had no role in that whatsoever and did not have notice of, of the issues and the constitutional violations that have been alleged today. Um, it's difficult to discern from the original complaint exactly what they're alleging as to the Houston Downtown Park Corp., and I think the District Court encountered those same issues. It appears by name only that we are identified in counts one, two, and five, uh, the First Amendment, uh, violation, prior restraint violation, and the restriction, um, on the freedom of, of religion. Um, when you get into the actual complaint, however, uh, the Downtown Park Corp. is only referenced, uh, very vaguely. Uh, the, within count one, it is simply the fact that they delegated operational authority to and management of the park to the Conservancy. That's it. There are no specific factual allegations as to the Downtown Park Corp. with respect to count one. There are no specific factual allegations as to count two, and there are no specific factual allegations as to Downtown Park Corp. with respect to count five. Um, as the, uh, District Court, uh, noted, uh, although the appellants talk about policies, they don't specify a specific policy applicable to the Downtown Park Corporation. Um, the, the District Court wrote, the policies outlined in the complaint are, quote, conclusory and devoid of critical factual enhancement, and, and that is the fundamental issue as it relates to, to my client. Uh, the, the facts supporting any type of claim against the Downtown Park Corp. simply are not in the complaint. Um, that goes to count one, count two, count five. Um, on appeal, your honors, the appellants have attempted to articulate a Monell liability claim against the Park Corp. for the first time. It is not in the complaint. It's our position that that allegation has been waived. They cannot bring that up on appeal. There are, uh, there are no allegations as to the Park Corp. with respect to failure to train, and there are no allegations as to the Park Corp. as, uh, in terms of ratification. Um, it, it is our position that, uh, when you look at the complaint, the District Court was well reasoned in granting the 12B motion to dismiss as to the Houston Downtown Park Corp. given the complete absence of any involvement whatsoever in the alleged incidents and the protests. Um, we, again, believe the Monell liability theory has been waived, um, and so it is our position, your honors, that the, uh, that the decision by the District Court should be affirmed, and the 12B motion to dismiss, uh, be affirmed as to the Downtown Park Corp. From what I can tell, neither of the defendant's briefs talk about Marsh v. Alabama, um, in fairness. Uh, I don't think it came up until the plaintiff's, uh, reply brief, uh, which is also fine, but I want to give you a chance to, uh, address Marsh if you'd like. Your honor, I'm not familiar with that case, uh, uh, you know, going back to the pleading issue for my client, you know, this is simply a failure to plead sufficient facts as to the Houston Downtown Park Corp., uh, and this court can affirm on that basis as to my client. Uh, if there are no other questions, I will, I will give back some time. Okay. Thank you, your honors. Your opponent now has two minutes for rebuttal. Thank you, your honor. Um, very quickly, first of all, uh, videos or speech. Um, you know, if, if a St. Paddy's Day parade is speech under Hurley, if violent video games are protected expression under Brown v. VMA, I mean, according to defendant's characterization, no musical composition or artwork would be protected. No court has ever adopted that characterization before. Um, with respect to, uh, uh, with, to Monell as the conservancy, you know, we, we explained in our briefing why we do not believe we should have to meet, uh, Monell as the conservancy, but it does, ultimately doesn't matter because we have done so. I mean, the, the conservancy states on video that it has a speech prohibition, granted that it, that it, um, you know, adopts on an ad hoc basis, but that it enforces against, um, our clients. It reaffirms this in its response to our May 2023 letter. On appeal, defendants describe their speech prohibition in terms of its content based on its viewpoint. It attempts to justify it based on, you know, potential, um, uh, impacts on other, on, uh, viewers. Um, and it attempts to defend it based on it being narrowly tailored. None of those statements can be reconciled with their claim that there's no speech prohibition here. Um, also, your honors, as you see on the video, uh, at no point do any of the defendants invoke a rule, um, that, uh, plaintiffs have broken. What they say repeatedly is that enforcement, um, of this prohibition is determined on a case by case basis and subject to the subjective determinations of conservancy's management and defendant, Mr. Mandel. That is impermissible viewpoint discrimination. As this court said in Robinson, censorship based on subjective determinations about what is offensive is impermissible viewpoint discrimination, period. Uh, your honor, very quickly touching on Mr. Dubois' free exercise claim. This is a claim that defendants have effectively conceded. They offer no arguments in response to ours. They rest solely on the claim that defendants were unaware of the religious motivations. Of course, they were made aware of this. Um, we outlined in detail the religious motivations in our May 2023 letter. In response, conservancy said our position has not changed. Even so, right, sorry, apologies. Even so, that is not a requirement. One quick question. Okay, well, he has a question. I just wanted to make sure. I didn't want to, I realize you have a brief time. I heard you say no Monell, you don't have a Monell obligation as to the conservancy. Do you have any response to the downtown park corporation? As the downtown park corporation, your honor, you know, we, we allege that the park corporation owns the land, that it is the one that directly entered into the operating agreement with the conservancy, that delegated exclusive rulemaking authority to it. Um, we allege that it has notice. Exhibit E of our complaint shows that we sent that May 2023 letter to the park corporation's registered agent, and the registered agent confirmed receipt. If the registered agent didn't inform the park corporation, that's a factual dispute that has no place here. So in an abundance of caution, we included them. If in discovery, it turns out there's no reason to hold them separately liable, um, you know, separate from the city, then we would dismiss them. But at this early stage, of course, we included them in the complaint. Thanks. All right. Thank you, your honors. Thank you, both sides. Your case is now under submission, and as I said before,